**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

DIAMOND STATE INSURANCE COMPANY,

       Plaintiffs,

                                  Case No. 3:13-cv-456-J-34PDB

vs.

BOYS' HOME ASSOCIATION, INC., d/b/a
Boys' Home Association of Jacksonville, et
al.,

       Defendants.

_____/

**O R D E R**

    **THIS CAUSE** is before the Court on Plaintiff/Counterdefendant Diamond State

Insurance Company's Dispositive Motion for Summary Judgment (Doc. 50; Motion), filed

on July 30, 2014. Defendant Boys' Home Association, Inc. (Boys' Home) filed a response

and cross-motion for summary judgment on August 13, 2014. See Opposition to

Plaintiff/Counterdefendant Diamond State Insurance Company's Dispositive Motion for

Summary Judgment and Cross-Motion for Summary Judgment (Doc. 55; Boys' Home

Response). In addition, Defendants A.D. and S.T. (the Parents), individually and on behalf

of their adopted children, J.D. and W.D. (the Minor Children) filed a response to the Motion

on September 2, 2014. See A.D. and S.T.'s Response to Diamond State's Motion for

Summary Judgment (Doc. 60; Parents Response).[1] With leave of Court, see Order (Doc.

---

[1] The exhibits to the Motion are located at Plaintiff Diamond State Insurance Company's Notice of Filing
Exhibits in Support of Motion for Summary Judgment (Doc. 49; Diamond State Notice). Boys' Home
separately filed exhibits in support of its Response as well. See Defendant's Notice of Filing Exhibits in
Opposition to Plaintiff's Motion for Summary Judgment (Doc. 59; Boys' Home Notice), filed August 27, 2014.
The Parents filed their exhibits at A.D. and S.T.'s Notice of Filing Redacted Excerpts from Diamond States'

64), Diamond State Insurance Company (Diamond State) filed a reply in support of its Motion on September 17, 2014.  <u>See</u> Plaintiff/Counterdefendant Diamond State Insurance Company's Reply Memorandum in Support of its Dispositive Motion for Summary Judgment (Doc. 66; Reply).  At the request of the parties, the Court entered an Order (Doc. 67) staying this case on September 18, 2014.  However, following an April 27, 2015 Telephonic Status Conference, <u>see</u> Minute Entry (Doc. 75), the Court lifted the stay and reactivated the case on May 6, 2015.  <u>See</u> Order (Doc. 77).  With the Court's permission, <u>see</u> Order (Doc. 82), Diamond State filed a supplemental reply brief to which the Parents filed a sur-reply.  <u>See</u> Plaintiff/Counterdefendant Diamond State Insurance Company's Supplemental Memorandum in Support of its Dispositive Motion for Summary Judgment (Doc. 83; Supplemental Reply), filed October 8, 2015; Defendants' A.D. and S.T. Response in Opposition to Plaintiff, Diamond State's Supplemental Memorandum in Support of its Dispositive Motion for Summary Judgment (Doc. 84; Parents Sur-Reply), filed October 22, 2015.  Accordingly, this matter is ripe for review. [2]

---

Response to Boys' Home Association's First Request for Production (Doc. 53; Parents Notice) on August 12, 2014.

In addition, contrary to Local Rules 3.01(a) and (b), United States District Court, Middle District of Florida (Local Rule(s)), Diamond State filed a separate statement of material facts in support of its Motion, to which the Parents filed a separate response. <u>See</u> Plaintiff Diamond State Insurance Company's Statement of Material Facts in Support of Motion for Summary Judgment (Doc. 51; Statement of Facts), filed July 30, 2014; A.D. and S.T.'s Response to Diamond States' Statement of Material Facts in Support of its Motion for Summary Judgment (Doc. 61; Response to Statement of Facts), filed September 2, 2014.  The Court has elected not to strike these documents for failure to comply with the Local Rules, but counsel for Diamond State and the Parents are advised to familiarize themselves with the Local Rules of this Court before submitting any future filings.

[2] Defendant Family Support Services of North Florida, Inc. (FSSNF) also filed a response in opposition to the Motion.  <u>See</u> Family Support Services of North Florida, Inc.'s Memorandum in Opposition to Diamond State Insurance Company's Dispositive Motion for Summary Judgment (Doc. 54), filed August 13, 2014.  However, pursuant to a Joint Stipulation for Dismissal with Prejudice (Doc. 86) filed on February 8, 2016, the Court dismissed the claims against FSSNF and terminated FSSNF from the Court docket on February 9, 2016.  <u>See</u> Order (Doc. 87).  Accordingly, the Court will not address the arguments raised on summary judgment as to FSSNF.

## I.     Background

This is an action for declaratory relief pertaining to an insurance coverage dispute between Diamond State, the insurer, and Boys' Home, its insured.  See Complaint for Declaratory Relief and Demand for Jury Trial (Doc. 1-3; Complaint).  Specifically, Diamond State issued a Commercial Insurance Policy to Boys' Home for the policy period spanning July 23, 2010, to July 23, 2011.  See Complaint, Ex. B (Doc. 1-2; the Policy).[3]  The Policy consists of coverage parts for Commercial General Liability, and Professional Liability, and a retroactive coverage date of July 23, 2004.  See Policy at 3, 5, 7.[4]  Significantly, the Policy is a "claims-made" policy such that "[c]overage is provided for liability if the claim for damages if [sic] FIRST MADE during the policy period on an event that occurred on or after the retroactive date, if any, and prior to the expiration date of the policy or Extended Reporting Period, if applicable."  See id. at 21, 31, 61.  The Parents, on behalf of their Minor Children, initiated an action against Boys' Home in Florida state court alleging that the Minor Children suffered damages as a result of Boys' Home's negligence.  See Complaint,

---

[3] In their Response to Statement of Facts, the Parents object that Diamond State has "failed to provide evidence in the form of an affidavit or sworn testimony to establish that" the copy of the Policy attached to the Complaint "is a true copy of the policy issued to [Boys' Home]," and that the copy included in the record "does not purport to be a certified copy of the policy in question."  See Response to Statement of Facts at 3. Notably, the Parents do not actually contend that the copy of the Policy before this Court is not a correct copy of the Policy issued to Boys' Home.  Indeed, the Parents cite extensively to this Policy in their Response to Diamond State's Motion.  See Parents Response at 1, 5, 7-8.  For example, in the second sentence of their Response the Parents state "Diamond State issued a Commercial Insurance Policy to Boys' Home Association, Inc." and cite to the Policy attached to the Complaint. Id. at 1.  As such, it appears that the Parents raise this form-over-substance authentication argument simply for the sake of arguing.  Because the Parents do not contend that the Policy is not authentic, only that it has not been authenticated, and because the Court has no reason to believe that the Policy could not be reduced to admissible form at trial, the Court finds it appropriate to consider this evidence in ruling on summary judgment.  See Mims v. Old Line Life Ins. Co. of Am., 46 F. Supp. 2d 1251, 1259-60, (M.D. Fla. 1999); Dubai World Corp. v. Jaubert, No. 09-14314-CIV, 2011 WL 579213, at *9 (S.D. Fla. Feb. 9, 2011); Prince Hotel, S.A. v. Blake Marine Grp., Civil Action 11-0537-WS-M, 2012 WL 4711897, at *1 n.5 (S.D. Ala. Oct. 2, 2012).

[4] Because the Policy itself is not consecutively paginated, the Court will cite to the Policy using the ECF page numbering.

Ex. A: First Amended Complaint (Doc. 1-1; State Complaint); <u>see also</u> <u>A.D. & S.T. ex. rel.</u> <u>J.D. & W.D. v. Family Support Servs. of N. Fla., Inc.</u>, Case No. 16-2011-CA-002567-XXXX-MA (Fla. 4th Cir. Ct. 2011) (Underlying Action).[5]   The State Complaint pertains to conduct allegedly occurring between October 21, 2004, and October 17, 2006.   <u>See</u> State Complaint ¶¶ 46, 77.   On April 26, 2013, Diamond State filed the instant lawsuit in which it seeks a declaratory judgment that the Policy provides no coverage as to both the duty to defend and the duty to indemnify for the claims asserted against Boys' Home in the Underlying Action.   <u>See</u> <u>generally</u> Complaint.   The Parents filed a Counterclaim (Doc. 16) against Diamond State on August 9, 2013, requesting a declaratory judgment that Diamond State has a duty to defend and indemnify Boys' Home with respect to the state claims.   <u>See</u> Counterclaim at 6.

### A. The Underlying Action[6]

The Parents make the following allegations against Boys' Home in the State Complaint.   Boys' Home is "a licensed child-placing agency, authorized by [the Department of Children and Families (DCF)] to conduct licensing studies of family foster homes and to certify to DCF that the home met its licensing requirements."   <u>See</u> State Complaint ¶ 13. On October 21, 2004, Annette Smith f/k/a Annette Ross (Smith) "submitted an application

---

[5] The First Amended Complaint is dated September 21, 2012, <u>see</u> State Complaint at 21, but the record does not reveal when the Parents initiated the Underlying Action in state court.   Regardless, Diamond State does not dispute that Boys' Home submitted the claim to Diamond State within the policy period.

[6] The Court emphasizes that this section merely summarizes the allegations against Boys' Home in the State Complaint, and does not reflect any independent resolution of factual issues.   The Court must determine whether Diamond State has a duty to defend based solely on the allegations in the State Complaint, regardless of what the actual facts may turn out to be.   <u>See</u> <u>infra</u> Part IV.A; <u>see</u> <u>also</u> <u>Feldman v. Imperium</u> <u>Ins. Co.</u>, No. 8:14-cv-1637-T-30EAJ, 2015 WL 5854153, at *7 (M.D. Fla. Oct. 5, 2015) ("Florida courts typically determine whether an insurer has a duty to defend by comparing the allegations in the underlying complaint to the coverage afforded under the policy.").

to [Boys' Home] to become a licensed foster parent." Id. ¶ 46.  Despite having the relevant information, Boys' Home "failed to conduct an appropriate background screening, including criminal and abuse records history, on [Smith's] married name, the name of her former husband, and the name[s] of all of her biological children." Id. ¶ 49.  If Boys' Home had conducted an appropriate background screening, it would have discovered that Smith's biological children were removed from her custody in 1992 as a result of verified allegations of abuse, which resulted in criminal abuse charges. Id. ¶ 50.  An appropriate background screening also would have revealed abuse allegations against Smith regarding her biological children in 2001 and 2002. Id. ¶ 51.  Boys' Home also failed to obtain written references from non-relatives and investigate Smith's "claim that she home-schooled her biological child." Id. ¶ 52.  Because Boys' Home failed to properly screen Smith for the foregoing "disqualifying information," it "licensed [Smith] to foster up to four (4) children on December 6, 2004." Id. ¶ 53.

On March 24, 2005, an agency acting on behalf of DCF, removed the Minor Children from the care of their biological mother and placed them in Smith's licensed foster home. See id. ¶¶ 14-16.  On April 6, 2005, two other foster children were removed from Smith's home as a result of abuse allegations. Id. ¶ 54.  The new foster mother for those children reported to Boys' Home on April 16, 2005, that one of the children had disclosed to her serious allegations of abuse perpetrated by Smith, but Boys' Home continued to license the Smith home. Id. ¶¶ 55-56.  Smith applied to renew her license in October of 2005, and Boys' Home "again failed to conduct an appropriate background screening." Id. ¶¶ 57-58. Notably, on October 26, 2005, Boys' Home received results "on the Central Abuse Hotline Record Search that indicated the prior abuse reports involving [Smith's] biological children,"

which gave Boys' Home "actual or constructive knowledge" that Smith had lied during her initial application for licensure. Id. ¶¶ 59-60. In addition, Smith lied about the reason the two children were removed from her home in April, but Boys' Home failed to review the prior year's abuse reports or its own file, and as such, failed to uncover the falsehoods. Id. ¶¶ 62-63. Thus, Boys' Home did not take that report and the subsequent allegations into consideration during the re-licensure process. Id. ¶ 63. On December 6, 2005, Boys' Home re-licensed Smith to care for two foster children, it increased her licensing capacity to four children on January 11, 2006, and on May 20, 2006, Boys' Home placed two additional foster children in the Smith home without conducting the assessments and obtaining the approvals required by DCF procedures. Id. ¶¶ 65-69. Notably, in April 2006, another abuse report alleged physical abuse of a foster child in the Smith home. Id. ¶ 67.

In June 2006, "there was an abuse report against Smith" involving her biological child, at which time an investigation revealed the prior abuse reports regarding Smith's abuse of her biological children in 1991, 2001, and 2002. Id. ¶¶ 70-71. Although DCF provided this information to Boys' Home, Boys' Home took no action and continued to license Smith. Id. ¶¶ 72-73. Finally, on October 6, 2006, another abuse report was made against Smith regarding the physical abuse of a foster child, and during the course of this investigation, all six of the foster children in the Smith home, including the Minor Children, disclosed "severe physical and emotional abuse and neglect." Id. ¶¶ 74-75. The investigation verified the abuse allegations and all of the children were removed from the Smith home. Id. ¶ 76. Boys' Home revoked Smith's license on October 17, 2006, as a result of the verified abuse, and in November 2006, Smith was arrested and charged with criminal child abuse and contributing to the delinquency of a minor. Id. ¶¶ 77-78.

Ultimately, Smith pled guilty to the charge of contributing to the delinquency of a minor in January 2007.  Id. ¶ 78.

In Count I of the State Complaint, the Parents assert a claim for negligence against Boys' Home.  See id. ¶¶ 123-126.  Pursuant to the foregoing allegations, the Parents allege that Boys' Home breached its duty to: (1) conduct a licensing study of Smith and certify to DCF that she met all of the DCF licensing requirements, (2) conduct an appropriate screening of Smith's background, (3) request Abuse Registry clearances for Smith, (4) conduct an employment history check and check references, (5) conduct an annual re-licensing study, (5) seek and obtain a waiver prior to placement of additional foster children in the Smith home, (6) deny, suspend, and/or revoke the foster home license upon discovery that Smith lied during the application process, and (7) deny, suspend, and/or revoke her license based upon "an intentional or negligent act materially affecting the health or safety of children in the home."  Id. ¶¶ 124-25.  The Parents also allege that, as a result of Boys' Home's negligence, the Minor Children have sustained permanent damages, "including but not limited to bodily injury and resulting pain and suffering, mental anguish, loss of capacity for the enjoyment of life, and expenses of therapeutic and psychiatric treatment."  Id. ¶ 126.

## B.    The Policy

The Policy at issue in this lawsuit provides liability insurance to Boys' Home in two coverage parts: Professional Liability and Commercial General Liability (CGL).  The CGL part excludes coverage for injuries "due to the rendering of or failure to render any professional service."  See Policy at 56.  The endorsement describes the professional services excluded from coverage as: "all professional services."  Id.  However, the

Professional Liability coverage part provides that Diamond State "will pay those sums that the insured becomes legally obligated to pay as 'compensatory damages' as a result of a 'wrongful act,'" which is defined to mean "any act, error or omission in the furnishing of professional social services." Id. at 61.

The CGL coverage part contains a "Physical or Sexual Abuse or Molestation Exclusion." Id. at 69. This Exclusion states:

> This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:
>
> 1. The actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured; or
>
> 2. The negligent:
>
>     a. Employment;
>     b. Investigation;
>     c. Supervision;
>     d. Reporting to the proper authorities or failure to so report; or
>     e. Retention;
>
>     of a person for whom any insured is or ever was legally responsible and whose conduct is described in Paragraph 1. above.

Id. The Professional Liability coverage part does not contain such an exclusion. Rather than excluding such claims from coverage, it imposes a sublimit on the amount of insurance for "wrongful acts involving sexual or physical abuse." Id. at 25.

Significantly, unlike the CGL coverage part, the Professional Liability coverage part contains a prior knowledge exclusions which states: "This insurance does not apply to: . . . Any 'claim', 'suit' or 'wrongful act' that might result in a 'claim' or 'suit', of which any insured had knowledge or could have reasonably foreseen, at the signing date of the application for this insurance." Id. at 61-63. A "claim" is defined as:

a written demand upon the insured for "compensatory damages", including, but not limited to the service of "suit" or institution of arbitration proceedings against the insured. "Claim" includes reports of accidents, acts, errors, occurrences, offenses or omissions which may give rise to a "claim" under this policy. "Claims" based on or arising out of the same act or interrelated acts of one or more insured will be considered to be based on a single "wrongful act".

Id. at 67. The term "suit" means "a civil proceeding in which damages for injury to which this insurance applies are alleged," including arbitration proceedings. Id.

## II.   Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[7] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."

---

[7] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amendments.

The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004)

(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III.    Applicable Law[8]

Pursuant to Florida law, "interpretation of an insurance policy is a question of law to be decided by the court." Gulf Tampa Drydock Co. v. Great Atl. Ins. Co., 757 F.2d 1172, 1174 (11th Cir. 1985) (applying Florida law).  In so doing, the court must construe the

---

[8] This case is before the Court based on its diversity jurisdiction.  See Complaint ¶¶ 2, 6-9.  As such, the Court applies the substantive law of the forum state, Florida.  See Auto-Owners Ins. Co. v. E.N.D. Servs., Inc., 506 F. App'x 920, 923 n.2 (11th Cir. 2013).  The parties do not dispute that Florida law applies.  See Motion at 8; Boys' Home Response at 8-19; see generally Parents Response.

"contract in its entirety, striving to give every provision meaning and effect." <u>Dahl-Eimers v. Mut. of Omaha Life Ins. Co.</u>, 986 F.2d 1379, 1382 (11th Cir. 1993) (citing <u>Excelsior Ins. Co. v. Pomona Park Bar & Package Store</u>, 369 So.2d 938, 941 (Fla. 1979)).  Where a term in an insurance policy is ambiguous, a court must "construe it in favor of the insured and against the insurer." <u>Gas Kwick, Inc. v. United Pac. Ins. Co.</u>, 58 F.3d 1536, 1539 (11th Cir. 1995) (citing <u>Davis v. Nationwide Life Ins. Co.</u>, 450 So.2d 549, 550 (Fla. 5th DCA 1984)).  However, a "court cannot rewrite an insurance contract to extend coverage beyond what is clearly set forth in the contractual language." <u>Szczeklik v. Markel Int'l Ins. Co., Ltd.</u>, 942 F. Supp. 2d 1254, 1260 (M.D. Fla. 2013) (quoting <u>Fla. Residential Prop. & Cas. Joint Underwriting Ass'n v. Kron</u>, 721 So. 2d 825, 826 (Fla. 3d DCA 1998)).  Although the insured bears the burden of proving that a claim is covered by the insurance policy, the "burden of proving an exclusion to coverage is . . . on the insurer." <u>LaFarge Corp. v. Travelers Indem. Co.</u>, 118 F.3d 1511, 1516 (11th Cir. 1997).  However, if there is an exception to the exclusion, "the burden returns to the insured to prove the exception and show coverage." <u>See</u> <u>Mid-Continent Cas. Co. v. Frank Casserino Constr., Inc.</u>, 721 F. Supp. 2d 1209, 1215 (M.D. Fla. 2010); <u>see</u> <u>also</u> <u>LaFarge Corp.</u>, 118 F.3d at 1516; <u>E. Fla. Hauling, Inc. v. Lexington Ins. Co.</u>, 913 So. 2d 673, 678 (Fla. 3d Dist. Ct. App. 2005).

## IV.   Discussion

### A. Duty to Defend

Under Florida law, an insurer's duty to defend is determined solely by the allegations in the underlying complaint. <u>See</u> <u>Category 5 Mgmt. Grp., LLC v. Companion Prop. & Cas. Ins. Co.</u>, 76 So. 3d 20, 23 (Fla. 1st. Dist. Ct. App. 2011); <u>see</u> <u>also</u> <u>Lawyers Title Ins. Corp. v. JDC (America) Corp.</u>, 52 F.3d 1575, 1580 (11th Cir. 1995).  "The duty arises when the

relevant pleadings allege facts that 'fairly and potentially bring the suit within policy coverage.'" Lawyers Title Ins. Corp., 52 F.3d at 1580 (quoting Lime Tree Vill. Cmty. Club Ass'n, Inc. v. State Farm Gen. Ins. Co., 980 F.2d 1402, 1405 (11th Cir. 1993)).  The actual facts of the situation are not relevant, such that "the insurer must defend even if facts alleged are actually untrue or legal theories unsound."  Id.  As a result, "an insurer's duty to defend is distinct from, and broader than, the duty to indemnify."  Sinni v. Scottsdale Ins. Co., 676 F. Supp. 2d 1319, 1323 (M.D. Fla. 2009).  In addition, where a complaint "alleges facts partially within and partially outside the coverage of the policy, the insurer is obligated to defend the entire suit."  Category 5 Mgmt. Grp., LLC, 76 So. 3d at 23.  Significantly, "[i]f an examination of the allegations of the complaint leaves any doubt regarding the insurer's duty to defend, the issue is resolved in favor of the insured."  Lawyers Title Ins. Corp., 52 F.3d at 1580-81.

### i. Professional Services

To determine whether Diamond State has a duty to defend Boys' Home in the Underlying Action, the Court must first consider whether the Underlying Action implicates the CGL or Professional Liability coverage part of the Policy.  As stated above, the CGL coverage part excludes coverage for "all professional services" whereas the Professional Liability coverage part insures Boys' Home for "any act, error, or omission in the furnishing of professional social services."  See Policy at 61, 67 (emphasis added).  The Policy describes the business of the Insured as a "Social Service Agency."  See Policy at 3. However, neither the CGL nor the Professional Liability coverage parts specifically define "professional services" or "professional social services."  Thus, the Court must determine whether the services at issue in the Underlying Action constitute the "professional social

services" of a Social Services Agency.  Both Diamond State and Boys' Home maintain that the Parents' claims relate to "professional social services" within the Professional Liability coverage part.  <u>See</u> Motion at 7; Boys' Home Response at 3.  Upon review of the State Complaint and Florida law, the Court accepts Diamond State and Boys' Home's characterization of the services as "professional social services," and therefore, will consider whether a duty to defend arises under the Professional Liability coverage part.[9] <u>See</u> <u>Auto-Owners Ins. Co. v. E.N.D. Servs., Inc.</u>, 506 F. App'x 920, 924-27 (11th Cir. 2013); <u>see</u> <u>also</u> Fla. Stat. §§ 409.175(5)(a), (6)(b); 63.202(1).

### ii.  Prior Knowledge Exclusion

The Court next considers whether the prior knowledge exclusion contained in the Professional Liability coverage part applies to the Parents' claims.  As stated above, this provision excludes from coverage "[a]ny 'claim', 'suit' or 'wrongful act' that might result in a 'claim' or 'suit', of which any insured had knowledge or could have reasonably foreseen, at the signing date of the application for this insurance."  <u>See</u> Policy at 63.[10] Diamond State maintains that Boys' Home had prior knowledge of the potential claim because, pursuant to the allegations of the State Complaint, no later than October 26, 2005, Boys' Home had

---

[9] The Parents argue that the allegations in the State Complaint do not pertain to "professional services" such that the CGL coverage part applies.  <u>See</u> Parents Response at 2-5.  The Parents further maintain that the abuse and molestation exclusion in the CGL coverage part does not exclude coverage because the Minor Children were not in the care, custody, or control of Boys' Home.  <u>Id.</u> at 5-6.  As such, the Parents contend that Diamond State has a duty to defend under this section of the Policy.  However, because the Court ultimately determines that Diamond State has a duty to defend under the Professional Liability coverage part, as set forth below, the Court need not address the Parents' alternative basis for coverage at this time.

[10] To establish the signing date of the application, Diamond State submits Boys' Home's insurance application which shows that Robert Brown signed the document for Boys' Home on July 20, 2010.  <u>See</u> Diamond State Notice, Ex. 3 at 21; <u>see</u> <u>also</u> Motion at 13.  Boys' Home and the Parents do not dispute this fact.  <u>See</u> Boys' Home Response at 13; Parents Response at 8 n.2.  As this evidence is uncontroverted and pertains to a fact that would not typically be included in the underlying pleadings, the Court finds it appropriate to consider this extrinsic evidence.  <u>See</u> <u>Composite Structures, Inc. v. Cont'l Ins. Co.</u>, 560 F. App'x 861, 865 (11th Cir. 2014); <u>see</u> <u>also</u> <u>infra</u> pp. 20-21.

actual or constructive knowledge that Smith had a criminal abuse history and had lied about it during her initial application for foster home licensure in 2004.  See Motion at 13.  In addition, Boys' Home received investigation reports from DCF which informed Boys' Home of several past abuse incidents involving Smith.  Id.  According to Diamond State, Boys' Home also knew of the abuse report on October 6, 2006, investigated that incident, and as a result of the verified abuse allegations, removed all of the children, including the Minor Children, from the home, and revoked Smith's foster care license.  Id. at 13-14.  Based on the foregoing, Diamond State argues that Boys' Home knew the Minor Children were abused in the Smith home, and knew of the prior abuse reports in the Smith home.  Id.  According to Diamond State, these abuse reports "meet the Policy definition of 'claim'," such that Boys' Home's "knowledge of a 'claim' was much more than reasonably foreseeable and therefore triggers the exclusion."  Id.

In its Response, Boys' Home argues that this provision is ambiguous because it does not indicate the "range of probability that Boys' Home is expected to disclose . . . ."  See Boys' Home Response at 11.  According to Boys' Home, it is "unclear as to which degree of certainty Boys' Home had an obligation to provide factual information for things that had a much lower probability of a claim occurring."  See id. at 12.  It is Boys' Home's contention that this exclusion "is ambiguous to the extent that it seeks Boys' Home to provide information regarding circumstances that are less than likely (a probability less than 50%) to result in a claim."  Id.  Boys' Home points to the Policy's definition of "Claim," which includes "reports of accidents, acts, occurrences, offenses or omissions which may give rise to a 'claim' under this policy," see Policy at 67 (emphasis added), and argues that

the use of the word "may" could "mean anything that has any possibility," which could include "everything said or done by any agent of Boys' Home . . . ." See id. at 10-11.

In addition, both Boys' Home and the Parents argue that the underlying claims were not reasonably foreseeable to Boys' Home when it signed the insurance application.  Boys' Home contends that it was not foreseeable that the abuse incident with the Minor Children would ripen into a claim because it receives numerous incident reports and less than one percent of them have ever resulted in a claim.  See Boys' Home Response at 12.  Indeed, Boys' Home maintains that it is "aware of only one previous incident in which Boys' Home was sued in regard to its supervision of an allegedly abusive caregiver."  Id.  Moreover, Boys' Home argues that it did not have knowledge of the extent of the abuse inflicted by Smith or the harm caused to the Minor Children, such that "there was no indication which would elevate the underlying circumstances to a point which would indicate to the management of Boys' Home that the incident was something that would likely have resulted in a claim."  Id. at 13.  Because "Boys' Home did not believe, nor should it have objectively believed, that a claim was likely to ripen from those circumstances," Boys' Home maintains that the exclusion does not apply.  In addition, the Parents argue that at the time Boys' Home signed the insurance application nearly four years had passed since Smith was accused of abusing the Minor Children, such that a claim was not reasonably foreseeable by that time.  See Parents Response at 7-8.

With respect to Boys' Home's contention that the prior knowledge exclusion is ambiguous, the Court notes that several Florida courts have considered and enforced similar provisions as unambiguous.  See Feldman v. Imperium Ins. Co., No. 8:14-cv-1637-T-30EAJ, 2015 WL 5854153, at *6 (M.D. Fla. Oct. 5, 2015) ("Courts have held that similar

prior-knowledge exclusions are unambiguous . . . ."); Cuthill & Eddy, LLC v. Cont'l Cas. Co., 784 F. Supp. 2d 1331, 1337 (M.D. Fla. 2011) ("Courts routinely affirm the denial of coverage where an insurance policy contains an unambiguous 'prior knowledge' provision and where an insured has knowledge, prior to the effective date of the policy, of acts or omissions that might reasonably provide the basis for a claim."); Coregis Ins. Co. v. McCollum, 961 F. Supp. 1572, 1579 (M.D. Fla. 1997); Lawyers Prof'l Liab. Ins. Co. v. Dolan, Fertig, & Curtis, 524 So. 2d 677, 678 (Fla. 4th Dist. Ct. App. 1988).  In its Motion, Diamond State maintains that the analysis utilized in those cases is applicable here, see Motion at 13-14, and Boys' Home, as an alternative to its ambiguity argument, relies on the same interpretation applied in those cases, see Boys' Home Response at 14-16. Notably, Boys' Home offers no reason why that interpretation is inapplicable to this Policy's analogous prior knowledge exclusion.  Nonetheless, upon consideration of the foregoing authority, the Court finds that the prior knowledge exclusion is not applicable to the allegations of the State Complaint.  As such, the Court need not address Boys' Home's ambiguity argument at this time.

The prior knowledge exclusion operates to deny coverage if, at the signing date of the application for the Policy, any insured "knew or could have reasonably foreseen any claim arising out of any act, error, omission or personal injury that might be expected to be the basis of a claim or suit."  See Coregis Ins. Co., 961 F. Supp. at 1579; see also Cuthill & Eddy, LLC, 784 F. Supp. 2d at 1337.  Under Florida law, this language has both a subjective and an objective component.  See Feldman, 2015 WL 5854153, at *6.  As explained in Feldman:

> The prior-knowledge exclusion may be triggered under two circumstances:
> (1) if the insured 'knew' that a wrongful act might be expected to be the

> basis of a claim; or (2) if the insured 'could have reasonably foreseen' that
> a wrongful act might be expected to be the basis of a claim.  The first prong
> requires an insured to have actual knowledge, as evaluated under a
> subjective standard.   By contrast, the second prong involves both a
> subjective and objective component.   Whether an insured 'could have
> reasonably foreseen' that a wrongful act might be expected to be the basis
> of a claim is an objective inquiry, but it must be based on the facts
> subjectively known by the insured.

Id. (internal citation omitted).  Thus, to determine whether the exclusion applies, the Court

must consider whether, when Brown signed the insurance application on July 20, 2010,

any insured subjectively knew that a wrongful act, such as the purportedly inadequate

investigations of Smith, might result in the Parents' claim, or objectively could have

reasonably foreseen that a wrongful act might be expected to be the basis of that claim.

According to the State Complaint, Boys' Home had a duty to investigate Smith

before licensing and re-licensing her foster home.  See State Complaint ¶ 124.  In addition,

the Parents allege that Boys' Home had a duty to obtain a waiver prior to placement of

additional foster children in the home, and a duty to suspend and/or revoke the license

upon discovery that Smith lied in her application, or engaged in acts which materially

affected the health or safety of the children in her care.  Id.  The claims are premised on

the contention that Boys' Home breached those duties and that the Minor Children suffered

damages as a result.  Id. ¶¶ 125-26.  Thus, to determine whether Boys' Home knew of the

potential claim or could have reasonably foreseen the claim, the Court considers whether

Boys' Home knew of any facts indicating a potential breach of its professional duties.  Upon

careful review, the Court finds no allegations of fact in the State Complaint which

demonstrate that Boys' Home was actually aware, at any time, that they may have

breached a duty.  Indeed, the allegations refer to Boys' Home's actual or "constructive"

knowledge, or information that Boys' Home knew or "should have known."  Id. ¶¶ 17, 60,

64.   Ultimately, Boys' Home revoked Smith's license after receiving verified reports of abuse, but even then it is unclear whether Boys' Home was aware of its failure to uncover the information which should have disqualified Smith for licensure or re-licensure at the time of her application.   Notably, the State Complaint alleges that Boys' Home revoked Smith's license on October 17, 2006, not because it discovered the information in Smith's background which it allegedly should have discovered earlier, but because it received new verified reports of abuse.  Id. ¶¶ 74-77.  The State Complaint reveals nothing about whether anyone at Boys' Home knew, at that time, of its purported investigative failures, or that its initial decision to license Smith may have been improper based on Smith's background.

Diamond State contends that the exclusion applies because Boys' Home had knowledge that Smith had abused the Minor Children.  See Motion at 14.  While the Court does not discount the seriousness of those circumstances, the salient question is whether Boys' Home was aware of any potentially wrongful actions on its part, e.g., the investigatory oversights resulting in the improper decision to license Smith, which would provide an objectively reasonable basis to believe that a claim against Boys' Home might arise.  See Fid. Nat'l Title Ins. Co. v. Houston Cas. Co., No. 6:11-cv-1438-Orl-28DAB, 2012 WL 4523666, at *7 (M.D. Fla. Sept. 30, 2012).  Although it is plausible that the investigation of Smith and the decision to revoke her license may have alerted someone at Boys' Home to its own prior errors, it is also plausible, as stated above, that Boys' Home was not subjectively aware that it potentially breached its duties when investigating and licensing Smith.  Thus, the Court is faced with "a situation in which there are plausible readings supporting and rejecting a duty to defend based on the applicability of the exclusion."  See First Specialty Ins. Corp. v. 633 Partners, Ltd., 300 F. App'x 777, 785 (11th Cir. 2008).

Florida law provides that where the allegations of an underlying complaint "'leave any doubt regarding the duty to defend, the question must be resolved in favor of the insured requiring the insurer to defend.'" Id. (quoting Baron Oil Co. v. Nationwide Mut. Fire Ins. Co., 470 So. 2d 810, 814 (Fla. 1st Dist. Ct. App. 1985)); Feldman, 2015 WL 5854153, at *7 (finding that because the allegations of the underlying complaint leave doubt as to the duty to defend, "Florida courts would typically hold that any doubt is resolved in favor of the insured, requiring [the insurer] to defend"). As such, consideration of solely the State Complaint warrants a finding that Diamond State must defend Boys' Home in the Underlying Action.

However, Diamond State also submits evidence outside the State Complaint in an attempt to establish Boys' Home's prior knowledge. Specifically, Diamond State cites to the abuse incident reports prepared by Boys' Home and DCF following the October 6, 2006 incident, and Boys' Home's letter to Smith revoking her license. See Diamond State Notice, Exs. 4-6. Diamond State also relies on testimony of Jerry Walters, Boys' Home's vice president of foster care services. Id., Ex. 2: July 19, 2011 Examination Under Oath of Jerry Lynn Walters (Doc. 49-2; Walters EUO). Specifically, Diamond State cites to Walters' testimony that Boys' Home investigated the October 6, 2006 abuse report alongside DCF, and argues that pursuant to that investigation, Boys' Home knew that "DCF verified physical abuse of one foster child and verified threatened harm against" the Minor Children. See Response at 13-14; Walters EUO at 49. Boys' Home responds to this evidence by presenting the affidavit of Robert Brown, the president of Boys' Home, in which he disavows any knowledge of "any incidents which could reasonably result in a claim against Boys' Home," and asserts that he "would have known if there had been any indication of wrongdoing on behalf of Boys' Home in regard to" the abuse of the Minor Children. See

Boys' Home Notice, Ex. A: Affidavit of Robert Brown (Brown Aff.) ¶¶ 2, 5.  In addition, Boys' Home relies on Walters' testimony that Boys' Home receives "[p]robably over a hundred, maybe 200" incident reports from DCF in a year, and internally generates "[p]robably 300" incident reports.  See Walters EUO at 27-28; Boys' Home Response at 6.  According to Brown, Boys' Home has only been involved in one lawsuit since Brown became the chief executive officer and president of Boys' Home in 1981.  See Diamond State Notice, Ex. 1: July 6, 2011 Examination Under Oath of Robert Brown (Doc. 49-1; Brown EUO) at 14, 23-24.  In addition, the Parents cite to Brown's testimony that Boys' Home reviews 500-600 incident reports each year, see Brown EUO at 32-33, and has only made two insurance claims in the past seven years, one involving a child that died, and the other involving allegations of child on child sexual abuse in a group home.  See Brown EUO at 31-33.[11]

Significantly, the parties do not address whether it is appropriate for the Court to consider this extrinsic evidence in its analysis of the duty to defend.  As stated above, the duty to defend is typically analyzed solely by reference to the allegations of the underlying complaint.  See Feldman, 2015 WL 5854153, at *7.  Nonetheless, although not cited by the parties, Florida law does recognize some circumstances where a court may consider evidence extrinsic to the underlying complaint when determining the duty to defend.  See 633 Partners, Ltd., 300 F. App'x at 785-87; Composite Structures, Inc. v. Cont'l Ins. Co., 560 F. App'x 861, 865 (11th Cir. 2014).  For example, in Higgins v. State Farm Fire & Cas.

---

[11] The Parents also rely on an email they sent to FSS on November 10, 2009 that was "friendly in tone" and, although discussing the abuse of the Minor Children by their former foster mother, "does not place one shred of blame upon [Boys' Home] or FSS."  See Parents Response at 8; Parents Notice at 12-16.  However, the Parents concede that Boys' Home was not made aware of this letter until December 7, 2010, almost five months after it signed the insurance application, see Parents Response at 8, thus the Court finds that, regardless of whether the Court determines it is appropriate extrinsic evidence, the letter is not relevant to any analysis of whether, based on the information in Boys' Home's subjective knowledge, the Parents' potential claim was reasonably foreseeable.

Co., 894 So. 2d 5 (Fla. 2005), the Florida Supreme Court identified "some natural exceptions" to the principal that the obligation to defend is determined solely by the claimant's complaint "where an insurer's claim that there is no duty to defend is based on factual issues that would not normally be alleged in the complaint." See Higgins, 894 So. 2d at 10 n.2.  In addition, Florida District Courts of Appeal have considered facts outside the underlying complaint to find no duty to defend where the insurer presented uncontroverted evidence of a fact placing a claim outside of coverage.  See Composite Structures, Inc., 560 F. App'x at 865 (citing Acosta, Inc. v. Nat'l Union Fire Ins. Co., 39 So. 3d 565 (Fla. 1st Dist. Ct. App. 2010) and Nationwide Mut. Fire Ins. Co. v. Keen, 658 So. 2d 1101, 1103 (Fla. 4th Dist. Ct. App. 1995)).  However, the Eleventh Circuit has cautioned that this departure from the general practice in Florida appears only in "exceptional cases in which courts have crafted an equitable remedy when it is manifestly obvious to all involved that the actual facts placed the claims outside the scope of coverage." See 633 Partners, Ltd., 300 F. App'x at 786; see also Composite Structures, Inc., 560 F. App'x at 865 n.2.  Thus, "in special circumstances, a court may consider extrinsic facts if those facts are undisputed, and, had they been pled in the complaint, they clearly would have placed the claims outside the scope of coverage." See Stephens v. Mid-Continent Cas. Co., 749 F.3d 1318, 1323 (11th Cir. 2014).

It appears that application of a prior knowledge exclusion may constitute a circumstance where consideration of extrinsic evidence is appropriate.  See Coregis Ins. Co., 961 F. Supp. at 1575, 1579 (considering extrinsic evidence to find no duty to defend without addressing the issue).  Indeed, one would not necessarily expect the State Complaint to disclose the facts relevant to whether Boys' Home had knowledge of its

alleged wrongful conduct prior to its execution of the insurance application.  See Composite Structures Inc. v. Cont'l Ins. Co., 903 F. Supp. 2d 1284, 1285 (M.D. Fla. 2012) ("While the general rule is that the duty to defend is based solely on the underlying complaint, an exception arises where that pleading would not be expected to disclose the facts necessary to determine the duty to defend.") aff'd 560 F. App'x 861 (11th Cir. 2014); see also Higgins, 894 So. 2d at 10 n.2 (noting the need for a declaratory action to determine the duty to defend where "the insurer claims that the insured did not provide sufficient notice of the claim and therefore breached an assistance and cooperation clause").  Regardless, even if the Court considers this evidence, the Court is not convinced of Boys' Home's prior knowledge.

Notably, although not explicitly addressing the extrinsic evidence exception, courts have denied coverage based on a prior knowledge exclusion when presented with direct, undisputed evidence of the insured's knowledge of the potential claim.  For example, in Coregis Insurance Company, the court found that the prior knowledge exclusion applied to bar coverage where an associate of the insured law firm drafted a memo prior to the effective date of the policy stating "it really looks like we screwed up," and warning of the possibility of a malpractice action.  See Coregis Ins. Co., 961 F. Supp. at 1575, 1579. Similarly, in Cuthill & Eddy, LLC, the court found no duty to defend based on a prior knowledge exclusion where, prior to the effective date of the policy, the insured received a letter from an attorney representing the insured's former clients informing the insured of several acts or omissions which seemed "to rise to the level of professional malpractice." See Cuthill & Eddy, LLC, 784 F. Supp. 2d at 1341-42.  Even absent a letter or memorandum referencing a potential lawsuit, one court found a prior knowledge exclusion

barred coverage where the facts showed that the insured affirmatively knew that a loss occurred because it may have failed to fulfill its duty to investigate the validity of a deed. See Houston Cas. Co., 2012 WL 4523666, at *5-8 (finding prior knowledge where insured closing agent was informed that the deed was a forgery, knew that its employee had been told to confirm the signature on the deed and that there was no evidence the employee ever did so, and knew that the title insurance company paid its policy limits as a result of the defect).

However, unlike those cases, the evidence presented here does not unequivocally establish that Boys' Home subjectively knew of facts from which a reasonable professional might expect a claim. Although the investigation reports, revocation letter, and testimony from Walters demonstrate that Boys' Home knew that Smith had abused the Minor Children and others, see Diamond State Notice, Exs. 4-6, given the testimony of Walters and Brown as to the high volume of incident reports that Boys' Home receives in a year, see Walters EUO at 27-28, Brown EUO at 32-33, it is plausible that the abuse report alone would not have alerted a reasonable professional in Boys' Home's position that a claim might result. Moreover, in Boys' Home's prior experience, only the gravest forms of abuse had actually resulted in claims. See Brown EUO at 23-24, 31-33. While there is no doubt that child abuse in any form is serious, based on this prior experience, it is reasonable that Boys' Home would not have foreseen a claim arising out of the DCF report where only "some indicator" of "threatened harm" to the Minor Children is documented. See Diamond State Notice, Ex. 6. Additionally, while the DCF report notes Smith's prior criminal history, there is nothing in the report that accuses Boys' Home of wrongdoing. See id. Indeed, Brown explicitly disclaims any knowledge of wrongdoing on Boys' Home's part with respect to

Smith.  See Brown Aff. ¶ 5.  As such, the evidence presented fails to establish that this is "the 'exceptional case' in which it is 'manifestly obvious to all involved that the actual facts placed the claims outside the scope of coverage.'"  See Feldman, 2015 WL 5854153, at *11 (quoting Stephens, 749 F.3d at 1323).  As such, the extrinsic evidence is insufficient to warrant a finding of no coverage at this stage in the proceedings.  In light of the foregoing, based on the allegations in the State Complaint, and "in the absence of any clear evidence to the contrary," the Court concludes that Diamond State has a duty to defend Boys' Home against the Parents' claims in the Underlying Action.  See 633 Partners, Ltd., 300 F. App'x at 785; Feldman, 2015 WL 5854153, at *11; see also Fid. Nat'l Prop. & Cas. Co. v. Boardwalk Condo. Assoc., Inc., No. 3:07cv278/MCR/EMT, 2010 WL 1911159, at *6 (N.D. Fla. May 12, 2010) ("Even if the letters are considered to be unclear, under Florida law, where the allegations 'leave any doubt as to the insurer's duty to defend, the question must be resolved in favor of the insured.'" (quoting Penn-Am. Ins. Co. v. Lucky Entm't, LLC, No. 8:08cv2538, 2010 WL 1645133, at *4 (M.D. Fla. Apr. 22, 2010))).[12]

## B.  Duty to Indemnify

The Court next considers whether Diamond State has a duty to indemnify Boys' Home under the Policy.  "An insurer's duty to indemnify is narrower than the duty to defend and must be determined by analyzing the policy coverage in light of the actual facts in the underlying case."  See J.B.D. Constr., Inc. v. Mid-Continent Cas. Co., 571 F. App'x 918, 927 (11th Cir. 2014).  As such, "[t]he duty to indemnify is dependent upon the entry of a final judgment, settlement, or a final resolution of the underlying claims."  Id.  Here, neither

---

[12] The Court notes that the Parents raise authentication objections and Boys' Home raises discovery-related objections to Diamond State's evidence.  See Parents Response to Statement of Facts at 2; Boys' Home Response at 4 & n.3.  Because the Court finds in favor of these parties despite consideration of this evidence, the Court finds it unnecessary to address the objections.

party presents any evidence that the Underlying Action has resolved.  Although it may be appropriate in some instances to consider the duty to indemnify before resolution of the underlying case, see Higgins, 894 So. 2d at 16-17, in this case, the factual issues relevant to a decision on the applicability of the prior-knowledge exclusion, will necessarily overlap with the negligence action against Boys' Home.  See Feldman, 2015 WL 5854153, at *11. Significant to both a finding of prior knowledge and negligence are the facts pertaining to what Boys' Home knew and when Boys' Home knew it during Smith's time as a foster parent.  Further development of the circumstances surrounding Boys' Home's purported failure to investigate Smith, its decision to license and re-license Smith, and its failure to revoke her license when reports were received will inform the Court in determining whether Boys' Home knew of the potential claim, or knew of facts from which an objectively reasonable professional might expect a lawsuit.  As such, until the Underlying Action is concluded, the Court finds that Diamond State and Boys' Home's cross-motions for summary judgment on the duty to indemnify are due to be denied as premature.  See id. at *11-12; Boardwalk Condo. Assoc., Inc., 2010 WL 1911159, at *7 ("[T]he duty to indemnify is not ripe for adjudication in a declaratory judgment action until there is a factual determination that the [insured] is liable in the underlying suit.").  Accordingly, it is

ORDERED:

1. Plaintiff/Counterdefendant Diamond State Insurance Company's Dispositive Motion for Summary Judgment (Doc. 50) is **DENIED, in part, and DENIED without prejudice, in part.**

   A. The Motion is **DENIED** with respect to Diamond State's duty to defend.

      B. The Motion is **DENIED without prejudice** as to the duty to indemnify. Diamond State may raise its coverage-related arguments, which are not yet ripe, after liability in the underlying lawsuit is resolved.

2. Defendant Boys' Home Association, Inc.'s Opposition to Plaintiff/Counterdefendant Diamond State Insurance Company's Dispositive Motion for Summary Judgment and Cross-Motion for Summary Judgment (Doc. 55) is **GRANTED, in part, and DENIED without prejudice, in part.**

      A. The Motion is **GRANTED** to the extent the Court declares that Diamond State owes Boys' Home a duty to defend in the Underlying Action.

      B. The Motion is **DENIED without prejudice** to the extent Boys' Home requests summary judgment on the duty to indemnify.

3. On or before **April 5, 2016**, the parties shall file a joint notice advising the Court of the status of the Underlying Action and addressing whether the Court should stay this action until resolution of that matter.

      **DONE AND ORDERED** in Jacksonville, Florida, this 22nd day of March, 2016.

_Marcia Morales Howard_
**MARCIA MORALES HOWARD**
United States District Judge

lc11
Copies to:

Counsel of Record
Pro Se Parties

26